United States District Court
Southern District of Texas
**ENTERED**
April 01, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BARBARA ANN THOMAS, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:14-CV-2711 |
| | § | |
| J.J. WILLIAMS, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER AND OPINION

Before the Court are Plaintiffs' Motion for Summary Judgment (Document No. 48), Defendant J.J. Williams' ("Williams") Response and Motion for Summary Judgment (Document No. 52), Plaintiffs' Reply in Support of its Motion (Document No. 65), Plaintiffs' Response to Defendant's Motion for Summary Judgment (Document No. 74), and Plaintiffs' Supplemental Brief (Document No. 100). Having considered these filings, the facts in the record, and the applicable law, the Court concludes that Plaintiffs Motion for Summary Judgment is denied, and Defendant's Motion for Summary Judgment is granted.

**Background**

Plaintiffs, Barbara Ann Thomas and her son, John Thomas, reside at 5816 Hirsch Road, in Houston, Texas (Document No. 32 at 2-3). Defendant Williams is a peace officer employed by the Houston Police Department ("HPD"). *Id*. at 2.

According to Williams' affidavit, the relevant investigation began in April of 2014, because complaints had been submitted to HPD about marijuana and drug dealer activity on the 5800 Hirsch Road block (Document No. 52-3 at 3). One complaint stated the address as "5814 1/," without providing a final digit, and another complaint stated that activity was occurring at

5814 Hirsch Road. *Id*.

On May 7, 2014, Officers Williams and Caldwell took a confidential informant (the "C.I.") to the location to attempt to make a narcotics purchase. *Id*. at 4. During this attempted buy the officers "maintained distant and rolling surveillance, so not to be 'picked off' by any 'look-outs,'" which had happened before with other attempted narcotics purchases in the complex. *Id*. The C.I. was sent to look for the apartment numbered 5814 ½, and returned having successfully purchased .27 grams of crack cocaine from a "black male on the porch." *Id*. Williams explains in his affidavit that this is referred to as a "dirty buy," and "a search warrant cannot be generated under these circumstances because there is no proof the crack came out of the apartment." *Id*.

Therefore the officers continued investigating, and identified a suspect named "Nash" as the seller. *Id*. Williams continued to survey the area and the suspect, but never saw him enter or leave a specific apartment; Williams "always noticed suspect Nash to be in the common areas of the complex or the parking lot of an adjacent corner store." *Id*. at 5. During this continued investigation Williams also used hcad.org attempt to "verify the addresses within the complex," but "found there is only 5812 and 5820 listed for the six buildings and twelve apartments." *Id*. at 4. Williams also used Google Earth to obtain a satellite photo of the complex. *Id*.

On May 20, 2014, Williams and Caldwell returned to the complex with the same C.I. *Id*. at 5. Williams stated in his affidavit that

> Keeping true to what proved to be successful tactics in the prior purchase, we maintained a distant and rolling surveillance, careful not to stay too long in one place and be "picked off". In doing so, we were not able to see every aspect of the purchase and had to verify what we had seen and what had transpired during the drug buy with what the C.I. told us when they reported back afterward.

*Id*. The C.I. returned with .19 grams of crack cocaine, and told the officers that he or she

observed Nash come out of his apartment, numbered 5818. *Id*. at 5-6. To confirm which door Nash used, Williams verified with the C.I. that Nash used the right door, "as far in the corner of the complex as you can go." *Id*. at 6. Williams was hesitant to walk through the complex to identify the numbers himself, "[k]nowing the dealers in and around the complex were organized with look-outs," and could not see the numbers from the across the street. *Id*. However Williams was confident in the information supplied by the C.I., and prepared a probable cause affidavit and search warrant for 5818 Hirsch Road. *Id*. at 6-7.

Williams and other officers executed this search warrant on May 24, 2014. *Id*. at 8. Williams stated that:

> As we approached the door of the far right apartment described by the C.I., I observed the last digit of the address of that apartment was a "6" instead of an "8", so it read "5816". I recognized the difference in the address in the probable cause affidavit and search warrant to that over the door of the subject apartment, […] But, based on past experiences, and the facts I have referenced above, I knew that address numbers can be misread for many reasons, and in fact it is not uncommon to encounter drug-related premises without an address.

*Id*. at 8-9. The officers then pried open the burglar bars and "[a]lmost simultaneously, Ms. Thomas opened her door and stepped back." *Id*. at 9. The team then conducted a security sweep of the apartment, "which took approximately 30 to 45 seconds," but "[a] search for narcotics was never started or attempted. During the safety sweep, it became apparent that the apartment did not give an indication as one being used to store or sell illegal drugs." *Id*. at 9-10.

Williams then apologized to Ms. Thomas, and asked her various questions to determine if another person was using her apartment to sell drugs. *Id*. at 10. Later, Williams returned to the complex with the C.I. who realized that he or she had made a mistake, because "the brick wall that runs partially between the two apartments blocked their view of Ms. Thomas' door." *Id*. at 11.

In their Second Amended Complaint, Plaintiffs describe the search as follows. The officers:

> r. forcibly entered Plaintiffs' locked front door at approximately 6:30 p.m.;
> s. found Plaintiffs therein huddled together in fear on the couch;
> t. seized Plaintiffs at gunpoint (at least three Defendants);
> u. admitted to Plaintiff Barbara Thomas that they were in the wrong house within approximately five minutes;
> v. detained Plaintiffs for approximately half an hour;
> w. accused Plaintiffs of having drugs in their home;
> x. performed an extensive search of Plaintiffs' home (at least two Defendants);
> y. caused damage to Plaintiffs' personal property in their home; and
> z. rendered the locking mechanism on Plaintiffs' front door completely inoperable

(Document No. 32 at 5-6). Therefore Plaintiffs allege that each officer[1] "violated their clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution to remain free from unreasonable searches of their home" and to "remain free from unreasonable seizures." *Id.* at 10, 15. Plaintiffs also allege that Williams "acquired a warrant to enter their home by swearing out an affidavit with materially false statements either knowingly or in reckless disregard for the truth." *Id.* at 16.

## Legal Standards

### A. Summary Judgment

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law governing the claims determines the elements essential to the outcome of the case and thus determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over such a fact is genuine if the evidence presents an issue "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Id.* at 250. The moving party bears the burden of identifying evidence that no genuine

---

[1] Plaintiffs' additional claims against the City of Houston are not at issue in these motions.

issue of material fact exists, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the court must view this evidence and all inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B. Qualified Immunity

The defense of "[q]ualified immunity shields government officials from liability when" they act within their discretionary authority and their actions do not violate "clearly established statutory or constitutional law of which a reasonable person would have known." *Gates v. Texas Dept. of Protective & Regulatory Servs.*, 537 F.3d 404, 418 (5th Cir. 2008). The purpose of this defense is to "balance[ ] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), and its effect is to "provide[ ] ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Because "qualified immunity is an immunity from suit rather than a mere defense to liability," *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012) (alterations omitted) (quoting *Pearson v. Callahan,* 555 U.S. 223, 237 (2009)), this "defense alters the usual summary judgment burden of proof" in that "[o]nce an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). Although all inferences are still drawn in the plaintiff's favor, it is the plaintiff who "bears the burden of negating qualified immunity." *Id*. The qualified immunity analysis consists of two prongs—one, whether an official's conduct violates a constitutional

right; the other, whether that right was clearly established at the time of the alleged violation—and the court may rely on either prong in its analysis. *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011) *cert. denied*, 132 S. Ct. 2433, 182 L. Ed. 2d 1062 (U.S. 2012).

Under the second prong of the qualified immunity defense, the standard is whether the defendant's actions were "'objectively reasonable' in light of 'law which was clearly established at the time of the disputed action.'" *Brown,* 623 F.3d at 253 (quoting *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004)). The standard of "objective reasonableness" is unique to this context: "This inquiry focuses not on the general standard . . . but on the specific circumstances of the incident—could an officer have reasonably interpreted the law to conclude that" his or her actions were justified? *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 383 n.1 (5th Cir. 2009) (citing *Brosseau v. Haugen*, 543 U.S. 194, 199-200 (2004)). "To be clearly established for purposes of qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Brown*, 623 F.3d at 253 (5th Cir. 2010).

**Discussion**

Plaintiffs argue that the undisputed facts demonstrate that Williams "unreasonably violated the Fourth Amendment to the United States Constitution by (1) knowingly making materially false statements to a magistrate under oath, (2) entering Plaintiffs' home without a warrant therefor, and/or (3) staying in Plaintiffs' home for an unreasonable period of time after discovering he had no right to be therein" (Document No. 48 at 1). The Court will examine each of these claims below, in sections 1, 2, and 3.

*1.*

The affidavit given to the Magistrate Judge by Williams described the location as

follows:

> The location may be particularly described as a duplex at 5818 Hirsch, Houston, Texas 77026. The duplexes located in the 5800 block of Hirsch all have a separate address for each front door. The duplex door marked "5818" sits on the east side of Hirsch and the front of the residence faces west. Duplex "5818" is located in the far southeast corner of the location. […] The numbers 5-8-1-8 are clearly posted by the front door of the duplex.

(Document No. 48-4 at 2). The affidavit then stated that "said suspected place is in the charge of and controlled by […] a black male known as 'Little Black [Nash].'" *Id*. In the affidavit Williams stated that he had probable cause, because, within the past forty-eight hours, he observed a confidential informant "go to, and return directly from, the listed location." *Id*. at 3. The informant returned with an amount of crack cocaine, and stated that he or she purchased the cocaine from the listed suspect while at the residence. *Id*. The Magistrate Judge subsequently issued a warrant for the residence (Document No. 48-5).

"The Supreme Court held in *Franks v. Delaware* that an officer may be liable [for a Fourth Amendment violation] when he 'makes a false statement knowingly and intentionally, or with reckless disregard for the truth' that results in a warrant being issued without probable cause.[2]" *Michalik v. Hermann*, 422 F.3d 252, 258 n.5 (5th Cir. 2005) (citing 438 U.S. 154, 155-156 (1978)); *Hart v. O'Brien*, 127 F.3d 424, 449 (5th Cir. 1997) ("Hart's arrest would violate the Fourth Amendment if Starnes intentionally or recklessly included false information in the affidavit and this information was necessary for probable cause."). "The Fifth Circuit has interpreted *Franks* liability to also include liability for an officer who makes knowing and intentional *omissions* that result in a warrant being issued without probable cause. *Id*. (citing *Hart v. O'Brien*, 127 F.3d 424, 448 (5th Cir. 1997)). Plaintiff needs to include "allegations of deliberate falsehood or of reckless disregard for the truth, ... accompanied by an offer of proof. [The allegations] should point out specifically the portion of the warrant affidavit that is claimed

---

[2] In this opinion the Court will not reach the materiality of Williams' statements in the affidavit.

to be false; and they should be accompanied by a statement of supporting reasons.... Allegations of negligence or innocent mistake are insufficient." *Winfrey v. San Jacinto Cty.*, 481 F. App'x 969, 980 (5th Cir. 2012) (citing *Franks*, 438 U.S. at 171).

Although "[t]he Fourth Amendment demands a 'truthful showing' of probable cause," it does not require "that every fact recited in a search or arrest warrant affidavit must be accurate, for probable cause may be founded upon hearsay, information received from informants, and information within the affiant's personal knowledge gathered hastily. A probable cause affidavit is 'truthful' if the information put forth therein is believed or appropriately accepted by the affiant as true." *Moreno v. Dretke*, 362 F. Supp. 2d 773, 800 (W.D. Tex. 2005) *aff'd*, 450 F.3d 158 (5th Cir. 2006) (citing *Franks*, 438 U.S. at 165).

One statement at issue in the affidavit is Williams' claims that he "observed the C.I. go to, and return directly from, the listed location" (Document No. 48-4 at 3). Plaintiffs argue that the evidence demonstrates that Williams intentionally misled the Magistrate Judge:

> Defendant Williams swore he "observed the [confidential informant] go to, and return directly from, the listed location [5818 Hirsch]." Defendant knew this was a lie; instead, he knew he only watched the informant "go to the building where Plaintiffs' duplex is located…". Defendant knew that Plaintiffs lived in a duplex, duplexes are "sometimes a little tricky", he never watched (and was physically incapable of watching) the informant enter any residence in the 5800 block of Hirsch, and the drugs in question were purchased outside of any apartment. Defendant knew he did not see a confidential informant enter 5818 Hirsch because (1) he concedes it did not exist, (2) his view of same was obstructed, and (3) he never saw a confidential informant go inside any home located on the 5800 block of Hirsch.

(Document No. 48 at 5-6) (citations and emphasis omitted). Because Williams knew that this information was false when he provided it to the Magistrate Judge, his conduct violated the Fourth Amendment. *Id*. at 5-6.

The Court does not agree that this is a misstatement. Williams explained what he meant by the "listed location" in his deposition: "In the way I worded it, what I recall was seeing them

go to the building, not necessarily to the door. Otherwise, I would generally state to the door, knock on the door, go in the door, through the door, something like that. I couldn't say that in this instance. So, I had to use the verbiage of 'location' meaning in that area, in that general immediate area" (Document No. 48, Exhibit A at 12). Williams explained that he last observed the C.I. "on the corner, pretty much in between the two complexes – the duplex where I thought 5818 was, which is – I learned was 5816 and 5816 ½." *Id*. at 12-13.

Plaintiffs also argue that Williams could not have seen the C.I. "enter 5818 Hirsch" and that he "never saw a confidential informant go inside any home located on the 5800 block of Hirsch (Document No. 48 at 5-6; Document No. 65 at 2). However, Williams' affidavit does not state that he saw the C.I. enter any apartment (Document No. 48-4). The affidavit does refer to the C.I.'s statement that he or she was "at the residence." *Id*. However, it does not say that the C.I. went inside; "at the residence" refers to the C.I.'s purchase of drugs outside of the apartment (Document No. 48, Exhibit A at 13). Therefore neither of these assertions were misstatements. Furthermore, Plaintiffs' focus on the fact that the purchase happened outside of the apartment is misplaced, because Williams explains in his statement that the C.I. watched the suspect retrieve the drugs from the apartment:

> The C.I. […] reported that as they were looking for suspect Nash in the common areas, they saw him as he came out of his apartment and locked the door behind him. He had come out of a different apartment than 5814 ½ Hirsch Rd., where earlier he was thought to reside. The C.I. explained that Nash gave an expression of body language which was perceived by the C.I. as if Nash did not want the C.I. to know where he lived and was surprised by the C.I. The C.I. offered to buy crack cocaine from suspect Nash who then went back inside the same apartment[3] and brought the 0.19 grams of crack cocaine out to them.

---

[3] Plaintiffs also argue that "this particular informant's mere conclusion is even further denigrated because the affidavit provides no evidence she had personal knowledge that drugs were inside any residence; instead, her conclusion was based on her subjective interpretation of the drug dealer's 'body language'" (Document No. 65 at 5) (citation omitted). However, this section of Williams' statement explains that the C.I. did not rely only on body language.

(Document No. 52-3 at 5).

Plaintiffs also object that Williams could not have seen the C.I. go to a location that does not exist (i.e. the unit numbered 5818), and that his view of the location was obstructed (Document No. 48 at 5-6). However, Williams' statement refers to the "listed location," which is also described as the duplex in the "far southeast" corner of the building (Document No. 48-4 at 2). Therefore this statement can be interpreted as Williams' seeing the C.I. go to, and return from, the far southeast duplex in the building. Although Williams' view of Plaintiffs' apartment door was obstructed, Williams does not specifically say that he saw the C.I. approach the door; the phrase "listed location" refers to the corner of the building, where Williams did see the C.I. (Document No. 48, Exhibit A at 12-14).

Even assuming that the affidavit contained material misstatements or omissions, Plaintiffs have not demonstrated that these were committed intentionally or recklessly. *Michalik*, 422 F.3d at 258 n.5. Where a party argues that "affidavits were knowingly or recklessly false," the qualified immunity inquiry includes consideration of "what the officers knew and did in evaluating whether it was objectively reasonable for them to believe that their conduct was lawful." *Winfrey*, 481 F. App'x at 981 n.9 (citations omitted).

Williams' statements in the affidavits were not intentionally false, but were based on his knowledge at the time. Williams testified that he watched the informant go to the corner of the duplex, where he thought unit 5818 was located, and that he used the word "location" to mean the "general area" of 5818 Hirsch (Document No. 48, Exhibit A at 12-13). Williams was also told by the C.I. that the suspect Nash went inside apartment 5818 to retrieve drugs, which the C.I. then purchased (Document No. 52-3 at 5). These facts, which are examined in detail above, demonstrate that Williams genuinely believed that the location was numbered 5818, and that the

C.I. had purchased drugs from that apartment.

Williams also did not make his statements in the affidavit recklessly. In order to prove reckless disregard for the truth, Plaintiffs would need to present evidence that Williams "in fact entertained serious doubts as to the truth" of the statements. *Hart*, 127 F.3d at 449 (citations omitted). As described above, Williams' statements were based on his knowledge at the time, and his genuine belief that the C.I. had purchased drugs from 4818 Hirsch. There is no evidence that Williams had any doubts about the information in the affidavit. Furthermore, Williams attempted "to identify and confirm the correct physical location and address number of the subject drug dealer," by running two separate drug buys, researching the apartment building online, confirming the location with the C.I., and surveilling the area (Document No. 52 at 6-7). These actions demonstrate that Williams was not acting with a reckless disregard for the truth.

Plaintiffs also argue that Williams' affidavit relies on hearsay without presenting a "substantial basis" for crediting it (Document No. 65 at 4) (citing *Illinois v. Gates*, 462 U.S. 213, 241 (1983)). In *Gates*, the Supreme Court held that:

> A sworn statement of an affiant that "he has cause to suspect and does believe that" liquor illegally brought into the United States is located on certain premises will not do. *Nathanson v. United States*, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933). An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause, and the wholly conclusory statement at issue in *Nathanson* failed to meet this requirement. An officer's statement that "affiants have received reliable information from a credible person and believe" that heroin is stored in a home, is likewise inadequate. *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). As in *Nathanson*, this is a mere conclusory statement that gives the magistrate virtually no basis at all for making a judgment regarding probable cause. Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others. In order to ensure that such an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued. But when we move beyond the "bare bones" affidavits present in cases such as *Nathanson* and *Aguilar*, this area simply does not lend itself to a prescribed set of rules, like that which had developed from *Spinelli*. Instead, the flexible, common-sense standard articulated in *Jones, Ventresca*, and *Brinegar* better serves the purposes of the

Fourth Amendment's probable cause requirement.

*Id*. at 239. The statements in Williams' affidavit go beyond the "wholly conclusory" statements in *Nathanson* and *Aguilar*, which are referenced above. The C.I. in this case did not merely state a belief that drugs were in the listed location; the C.I. himself or herself purchased drugs from the suspect at the listed location (Document No. 48-4 at 3). Furthermore, Williams was nearby during the drug purchase, checked the C.I. for contraband/drugs before and after the purchase, and verified that the "purchased crack" was cocaine. *Id*. Williams' corroborative efforts constitute a substantial basis for crediting the hearsay, and concluding that probable cause to search the residence existed. *Gates*, 462 U.S. at 241 ("Our decisions applying the totality-of-the-circumstances analysis outlined above have consistently recognized the value of corroboration of details of an informant's tip by independent police work.").

Furthermore, under the "totality of the circumstances" the magistrate judge was entitled to rely on the information from the C.I., because the C.I. had previously proven to be reliable.[4] *United States v. McKnight*, 953 F.2d 898, 905 (5th Cir. 1992) ("The Constable's assertion that the confidential informant was 'reliable' and had 'furnished him with information in the past that has proved to be reliable and true' provided the magistrate with sufficient indicia of the reliability and veracity of the informant's tip."). Similarly, Williams' affidavit stated that "[t]his informant has on numerous occasions provided officers with information which has been proven to be true and correct. This informant has in the past provided officers with honest and reliable information" (Document No. 48-4 at 3). This statement of reliability further demonstrates that there was a substantial basis for crediting the hearsay of the C.I.

Plaintiffs are unable to demonstrate that Williams violated the Fourth Amendment via his

---

[4] Plaintiffs are correct, though, that *U.S. v. Blount*, cited by Defendant, actually refers to information from an ordinary citizen, not a paid informant (Document No. 65 at 8) (citing 123 F.3d 831, 835 (5th Cir.1997)).

statements in the affidavit; therefore Williams is entitled to qualified immunity on this claim.

*2.*

Plaintiffs have alleged a violation of a constitutional right under the first prong in determining qualified immunity, as they argue that Defendants "did not have a warrant or any other constitutionally sufficient justification for entering the Plaintiffs' home." *Rogers v. Hooper*, 271 F. App'x 431, 433 (5th Cir. 2008). "The law of this Circuit clearly establishes that searches of the wrong residence are presumptive constitutional violations." *Hunt v. Tomplait*, 301 F. App'x 355, 361 (5th Cir. 2008) (not selected for publication).

However, under the second prong, the Court must determine "whether the defendant's actions were 'objectively reasonable' in light of 'law which was clearly established at the time of the disputed action.'" *Brown,* 623 F.3d at 253 (quoting *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004*)). See also Cannady v. State*, 582 S.W.2d 467, 469 (Tex. Crim. App. 1979) ("The test to be applied to searches outside the scope of a search warrant is whether the search was unreasonable, since only unreasonable searches are prohibited by the Fourth Amendment of the United States Constitution."). Although warrantless searches of a person's home are "presumptively unreasonable," "law enforcement officers are generally granted qualified immunity if the evidence is undisputed that they merely made an honest mistake when entering the incorrect home." *Hunt*, 301 F. App'x at 359 (citations omitted). In a situation where officers entered the wrong residence, the facts must be "consistent with a reasonable effort to ascertain and identify the place intended to be searched." *Rogers*, 271 F. App'x at 435.

The Court finds that Williams made an "honest mistake" when entering the Plaintiffs' home. *Id*. Williams stated that he did not intentionally enter the incorrect residence, but that he "believed the information provided to him by the C.I.," who stated that the drug dealer was

exiting from "the farthest apartment to the right in that same building that was described in Williams' affidavit and deposition testimony" (Document No. 52 at 10-11). Williams relied in good faith on this description of the physical location, and therefore entered apartment 5816, rather than 5818.[5] *Id. See Williams v. State*, No. A14-87-01015-CR, 1989 WL 34433, at *1 (Tex. App. Apr. 13, 1989) (not designated for publication) ("[T]he executing officers are entitled to rely upon the entire description given in the warrant, including the physical description and the allegations of control and occupancy.") (citations omitted); *Fifty-Six Thousand, Seven Hundred Dollars in U.S. Currency v. State*, 710 S.W.2d 65, 71 (Tex. App. 1986), *rev'd on other grounds*, 730 S.W.2d 659 (Tex. 1987) ("Even if the numerical address is wrong, the warrant may still be valid if the description is adequate to direct the officer to the correct place.") (citing *Olivas v. State*, 631 S.W.2d 553, 556-557 (Tex. App. – El Paso 1982, no pet.)); *Guzman v. State*, 508 S.W.2d 375, 375 (Tex. Crim. App. 1974) ("[W]here search warrant directed search of house numbered '7307,' but warrant gave description of house conforming to house numbered '7309,' and house at '7307' did not match any of the physical characteristics of house to be searched, officers were entitled to rely upon the entire description given in the warrant and search of house numbered '7309' was lawful."). The reasonableness of this decision is furthered by the similarity in the end digits, 6 and 8, and the fact that the apartment numbers could only be seen when standing underneath the top of the door, and the numbers are "folded a little at the top"

---

[5] Plaintiffs state in their response that "Defendant argues (without citation to any fact or precedent) that 'the physical location is as important or more important than an address number.' This conclusion is clearly contrary to Texas precedent" (Document No. 74 at 2-3) (citing *Balch v. State*, 134 Tex. Crim. 327, 329, 115 S.W.2d 676, 677 (1938, no pet.); *Ervin v. State*, 165 Tex. Crim. 391, 392, 307 S.W.2d 955, 955-56 (1957, no pet.); *Childress v. State*, 163 Tex. Crim. 467, 469, 294 S.W.2d 110, 111 (1956, no pet.)). However, in discussing the three cases cited by Plaintiff, Judge Davidson wrote that "[b]efore the writing of the opinion of the majority of this court in this case, I had deemed it axiomatic that the premises searched must correspond with those described in the search warrant. Such, however, is no longer true." *McCormick v. State*, 169 Tex. Crim. 53, 56, 331 S.W.2d 307, 309 (1960) (Davidson, J., dissenting).

(Document No. 48, Exhibit A at 18).

The Court also finds that Williams made a "reasonable effort to ascertain and identify the place intended to be searched." *Rogers*, 271 F. App'x at 435. Throughout the investigation, Williams "ran two drug buys […] from a suspect known as 'Nash' operating out of the complex;" "used HCAD.ORG to attempt to identify the addresses or physical locations for the various apartments in the subject complex in the 5000 block of Hirsch Rd;" and "used Google Earth's satellite webpage to further attempt to identify the physical locations or address of each of the apartments and buildings in the complex" (Document No. 52 at 6). Williams also "conducted surveillance of the complex between May 7, 2014 and May 20, 2014, and repeatedly saw suspect Nash in the common area of the complex." *Id*. Although hindsight now demonstrates that Williams' actions were insufficient, they were reasonable under the law in this circuit. *See Rogers*, 271 F. App'x at 435. *Hunt v. Tomplait* did not grant qualified immunity to police officers who searched the wrong residence, because the officers did not read the warrant, which is "the most basic step an officer can take in ascertaining the place to be searched." 301 F. App'x at 361. The circumstances here demonstrate far more diligence than that taken in *Hunt*.  As Plaintiffs have not demonstrated that the mistaken search of their residence was unreasonable, Williams is entitled to qualified immunity on this issue.

Plaintiffs also argue that the warrant was invalid[6] on its face, as it was "subject to more than one interpretation" (Document No. 48 at 8). However, the warrant describes the unit as the "far southeast corner of the location," as well as giving the number 5818 (Document No. 48-5 at

---

[6] The Fifth Circuit has held that "[t]he principles of *Franks* have never been applied to facially invalid warrants, and we decline to so extend *Franks* today." *Kohler v. Englade*, 470 F.3d 1104, 1114 (5th Cir. 2006) (dismissing *Franks* claim against officer where "there was insufficient evidence to establish probable cause on the face of [officer's] warrant affidavit"). Therefore, Plaintiffs' allegation of a *Franks* violation, discussed in Section 1, appears to conflict with their allegation that the warrant was invalid.

2). The physical description of the location clearly designates only one apartment and the address also designates only one apartment; therefore the warrant was not subject to more than one interpretation on its face. *Maryland v. Garrison*, 480 U.S. 79, 85 (1987). *See also United States v. Cotham*, 363 F. Supp. 851, 855 (W.D. Tex. 1973) ("It is well established that an error in the description of the premises to be searched is not automatically a fatal defect."). With the benefit of hindsight, we now know that the C.I. actually purchased drugs from the unit next door to Plaintiffs' (i.e. one unit over from the far southeast corner of the location), and that a unit numbered 5818 does not exist. To the extent that this creates an ambiguity, we must "judge the constitutionality of [the officers'] conduct in light of the information available to them at the time they acted." *Id*. At the time the warrant was issued, Williams reasonably believed that the C.I. had purchased drugs from the apartment in the far southeast corner, and reasonably believed the C.I.'s statement that the apartment was numbered 5818 (Document No. 52-3 at 5). As discussed above, Williams took several measures to verify this information. *United States v. Perez*, 484 F.3d 735, 742 (5th Cir. 2007) (investigation found sufficient where "officers performed a public records check, a utilities company check, and an internet white pages check, all indicating" that the residence was occupied by the plaintiff alone). Therefore the warrant was valid when issued.

**3.**

Finally, Plaintiffs state that Williams "stayed in Plaintiffs' home for an unreasonable period of time after discovering he had no right to be therein," because Williams remained in the residence for "approximately 10 extra minutes" while investigating, without immediately discontinuing the search (Document No. 48 at 9). Plaintiffs claim that Williams is not entitled to qualified immunity, as his behavior "crosses the line between a reasonable mistake and

affirmative misconduct that traditionally sets the boundaries of qualified immunity." *Id.* (citing *Simmons v. City of Paris, Texas*, 378 F.3d 476, 479-80 (5th Cir. 2004)). Plaintiffs also argue that the safety sweep done by the officers constitutes a search (Document No. 65 at 21) (citing *Maryland v. Buie*, 494 U.S. 325, 327 (1990)).

In response, Williams states that the officers only conducted a safety sweep of the apartment, taking less than one minute, and spent the remaining ten minutes inside the apartment "sitting with Ms. Thomas on her couch asking her questions to determine if others might be using her apartment unbeknownst to her while she was away" (Document No. 52 at 12). Therefore, Williams states that the "total time searching was zero." *Id.*

*Remaining in the residence*

The Supreme Court has stated that, when officers "mistakenly execute a search warrant on the wrong address," they are "required to discontinue the search of respondent's apartment as soon as they ... [are] put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." *Simmons*, 378 F.3d at 479 (citing *Maryland v. Garrison,* 480 U.S. 79, 88 (1987)). In *Simmons*, officers mistakenly searched the wrong house. *Id.* The officers stated that they left the house immediately upon realizing their mistake, but the plaintiffs testified that the officers remained inside the house for "five to six minutes" and searched some of the bedrooms. *Id.* at 480. Due to the inconsistencies in testimony, the district court found "a genuine dispute of material fact as to how long the officers remained in the house after discovering that they had entered the wrong house and detained the wrong individuals," which the Fifth Circuit affirmed. *Id.* The Fifth Circuit also stated that:

> Qualified immunity does not provide a safe harbor for police to remain in a residence after they are aware that they have entered the wrong residence by mistake. A decision by law enforcement officers to remain in a residence after they realize they are in the wrong house crosses the line between a reasonable mistake and affirmative misconduct that

traditionally sets the boundaries of qualified immunity.

*Id*. at 481. *Simmons* cited with approval the Sixth Circuit case of *Pray v. City of Sandusky*, 49 F.3d 1154 (6th Cir. 1995). *Id*. The facts in *Pray* were similar to *Simmons* and the facts in this case, as the police mistakenly entered the wrong residence. *Id*. (*citing* Pray, 49 F.3d at 1160). In *Pray*, the plaintiffs contended that the defendant officers "secured the Pray residence for an additional four to five minutes" and proceeded to look for "something or someone" after realizing they were in the wrong house. 49 F.3d at 1160. Therefore a genuine issue of material fact remained "to determine which, if any, of the illegal searches and seizures took place *after* the officers discovered or reasonably should have discovered that they were in fact in the wrong residence." *Id*. In the case at hand, both parties are in agreement that Williams remained inside the Plaintiffs' residence after discovering that he was in the wrong location (Document No. 48, Exhibit A at 52; Document No. 52 at 12; Document No. 65 at 21-22). Therefore a genuine issue of material fact does not exist here; the question is solely whether it was unreasonable as a matter of law for Williams to remain in the apartment.

The statements of each officer demonstrate that the execution of the search warrant was aborted, and state that Williams realized soon after the entry and initial sweep that something was not right. Williams himself testified that it took him "maybe five minutes" to realize that he was in the wrong location (Document No. 48, Exhibit A at 52). Officer Elkin says in his statement that, after the initial entry and sweep of the apartment, he "was informed we were not going to search the residence because Officer Williams felt this was not the correct apartment that was selling narcotics" (Document No. 53-5 at 1). Similarly, Officer Nguyen stated that he assisted with the sweep of the apartment "to clear it for any potential threats," and heard shortly after that "there was a problem with the location" and the search "was going to be aborted." *Id*. at

9. Officer McClelland also stated that "once we were inside the residence and completed our initial sweep, Officer Williams informed us that something wasn't right about the location and we were not going to conduct an evidentiary search." *Id.* at 16.

Plaintiffs argue that Williams was required to leave immediately, regardless of whether a search was performed (Document No. 65 at 21). Plaintiffs cite *Simmons* for the proposition that "[a] decision by law enforcement to *remain in a residence* after they realize they are in the wrong house crosses the line between a reasonable mistake and affirmative misconduct that traditionally sets the boundaries of qualified immunity." *Id.* (citing 378 F.3d at 479-80) (emphasis added by Plaintiffs). However, in *Simmons*, the plaintiffs had testified that the officers searched some of the bedrooms after realizing they were in the wrong house. 378 F.3d at 480. Similarly in *Pray*, the officers continued looking through the residence, after realizing they were in the wrong house. 49 F.3d at 1160.

There is a substantial difference between continuing to execute a search of the apartment, and the actions taken by Williams. Williams testified that he continued talking with Ms. Thomas, to find out if anyone else had access to the apartment (Document No. 48, Exhibit A at 54). Williams also testified that he believed it was "reasonable to stay after the raid to talk to Ms. Thomas" as he "owed her an explanation." *Id.* at 138. Plaintiffs offer no evidence that either Ms. Thomas or her son asked Williams to leave. The cases cited by Plaintiffs do not definitively demonstrate that the actions taken by Williams, after realizing he was in the wrong apartment, were unreasonable as a matter of law. Upon reading *Simmons* and *Pray*, it would be unreasonable for Williams to continue the search; however, Williams could have reasonably interpreted those cases as allowing him to remain in the apartment in order to explain his actions to Ms. Thomas. Therefore Williams could have "reasonably interpreted the law to conclude that"

his actions were justified, and qualified immunity as to his remaining in the apartment is appropriate. *Ontiveros*, 564 F.3d at 383 n.1 (citation omitted).

*The safety sweep*

The case cited by Plaintiffs, *Maryland v. Buie*, describes a protective sweep as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." 494 U.S. at 327. "However, the Fifth Circuit has held that 'arrest is not always, or *per se,* an indispensable element of an in-home protective sweep....'" *Cooksey v. State*, 350 S.W.3d 177, 185 (Tex. App. 2011) (citing *United States v. Gould,* 364 F.3d 578, 584 (5th Cir. 2004)).

According to Williams, immediately on entering the Plaintiffs' home he "went directly to the rear and I believe to the far back bedroom" executing "a sweep of the bedroom for bodies, persons hiding" (Document No. 48, Exhibit A at 49). Williams stated that "other people" finished the sweep, "looking anywhere a body could hide." *Id*. This included looking in the closet and moving things around, and looking under the bed. *Id*. at 49-50. Williams' initial protective sweep took "less than a minute," and then he began talking to Ms. Thomas. *Id*. at 52. The other officers all corroborate that the protective sweep of the apartment took place first, and then Williams made the decision to abort the search (as discussed above). In his statement, Williams stated that his execution of the protective sweep took place within the first minute of his time inside the apartment, during which "it became apparent that the apartment did not give an indication as one being used to store or sell illegal drugs" (Document No. 52-3 at 9-10). Considering the brevity of the protective sweep, which took 30 to 45 seconds, it is unlikely that Williams could have come to a realization that he was in the wrong apartment, and aborted the

sweep, before its completion.[7] *Id*. Therefore, as the protective sweep took place before Williams' realization that the officers were in the wrong place, Williams is entitled to qualified immunity on this issue.

Furthermore, there are no cases cited by Plaintiffs which would require Williams to abort a safety sweep upon realization that the officers were in the wrong apartment. Plaintiffs make a lot of the statement in *Buie* that a protective sweep constitutes a search; however, a protective sweep, done for the safety of the officers, is very different from a search for contraband. Under *Pray* and *Simmons*, Williams was on notice that he was required to abort the search upon realizing the officers were in the wrong apartment. However he was not specifically on notice that he was required to abort a protective sweep, further demonstrating that qualified immunity is appropriate.

**Conclusion**

As described above, Williams is entitled to qualified immunity on Plaintiffs' claims. Therefore the Court hereby

ORDERS that Plaintiffs' claims against Defendant Williams are DISMISSED.

SIGNED at Houston, Texas, this 31st day of March, 2016.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE

---

[7] In his deposition, Williams stated that it took him "maybe five minutes" to realize he was in the wrong apartment (Document No. 48, Exhibit A at 52). Regardless, though, he stated that the protective sweep occurred in "less than a minute," so the sweep took place *before* his realization that he was in the wrong place. *Id*.